SAMUEL LUCAS *et al. vs.* THE ATTORNEY GENERAL AT THE RELATION OF MICHAEL MCBLAIR AND GEORGE COOKE, THE STATE'S COMMISSIONERS OF LOTTERIES.—*December,* 1841.

Commissioners appointed by act of Assembly with authority to raise a certain sum of money by the sale of schemes and tickets in a lottery having exhausted their privilege in construction of law by the schemes and tickets

offered for sale, yet alleging they had not in fact raised the required sum, proposed to offer new schemes, and proceed as before with a view to realize the sum authorised to be raised, may be restrained by injunction, upon the relation and information of the lottery commissioners uniting in a bill with the Attorney General in behalf of the State, showing the exhaustation of the powers under the grant.

By the act of 1838, chap. 323, commissioners were appointed with full power, by a scheme or schemes of lottery, and the sales thereof, or of the tickets therein, and without being subject to any tax, to raise the sum of one hundred and fifty thousand dollars, free and clear, and over and above, all expenses, and charges, and interest whatsoever. By the act of 1839, ch. 52, it was enacted, that the privilege of drawing a scheme or schemes of lotteries conferred as above, should cease so soon as by the drawing of the said schemes the nett sum of $225,000 shall have been raised. By the second section of the act of 1838, the scheme or schemes "shall be approved by the Commissioners of Lotteries, or any one of them, before the same or any tickets shall be drawn, or be authorised to be sold, and the commissioners appointed by the act of 1838, were required to give bond for the faithful discharge of their duties." HELD, that in making this grant, the Legislature assumed, that all the tickets in the schemes which the said commissioners so appointed, would propose, and put into market, would be sold before the drawing of any such scheme, and that as they had proposed, and in part sold, various schemes which purported to raise a larger sum than they were authorised to raise, the grant was exhausted.

The act of 1817, ch. 154, sec. 1, provides, that in all cases where lotteries have been heretofore authorised, under which power is given to raise a particular sum of money, by one or more lotteries, and the managers may have drawn a lottery or lotteries, the schemes of which purported to raise the sum authorised to be raised, that in all such cases the power and authority given to raise money thereby, be and the same is hereby considered as completed, and the power to draw any other lottery or lotteries under the same authority, be and the same is hereby declared at an end. HELD, that this enactment, though in terms not declaratory, yet such must be its judicial construction; and it must be regarded as of controlling influence in the ascertainment of the legislative will in all subsequent acts upon such subjects. That act was not only intended to raise revenue for the State, but also prescribed rules and regulations in respect to all lotteries to be drawn in the State, and the approval of all schemes by the Lottery Commissioners.

The act of 1828, ch. 129, sec. 3, prescribes a rule of conduct for the Lottery Commissioners in all future time, as well in its terms as in its nature and object, embracing future as well as antecedent lottery grants.

As a general proposition it is true, that all schemes of lotteries drawn after the act of 1828, whether under antecedent or subsequent grants, must be submitted to the Commissioners of Lotteries for their approval and determination, whether they are authorised by law.

The face of the scheme furnishes the sole test to those commissioners, whether the grant is exhausted or not.

Lucas *et al. vs.* The Lottery Commissioners.—1841.

The Legislature never contemplated the drawing of lotteries upon the sale of a small portion of their tickets.

The terms and expressions "to raise a sum," "to propose a scheme or schemes to raise a sum" by lottery, as used in the acts of this State, have the same meaning and effect.

The court will not by implication give such a construction to a lottery grant, nor establish such a rule of interpretation, as must oblige it to repeal an important branch of the State's annual revenue.

In lottery grants, except those drawn by the Lottery Commissioners for the benefit of the State, under peculiar legislative provisions applicable to them only, every scheme is construed to raise the sum it purports to raise.

Whether one act of Assembly repeals another by implication, is a question of intention to be deduced from a just construction of the act relied upon as repealing a prior act. To have the capacity of operating a repeal, it must be repugnant to the former law, or it will be the duty of the court so to construe them that they may stand together. Per ARCHER, J.

It is important to enquire into the nature and object of an act relied upon as repealing a prior act, for its construction may materially depend upon its character. Per ARCHER, J.

A different rule of interpretation is applied in the construction of grants by the public of a private nature, and grants by the public for the public benefit. In the former, should any ambiguity arise, the construction is to be in favor of the State; in the latter a different rule should be applied. The rules of interpretation in each case, though variant, are founded on the same principle; which is the public interest and benefit. Per ARCHER, J.

An act which authorised the erection of a State Armory with apartments for military drill, to be under the control of the State—and structures and contrivances for alarm bells, and signals for fire, in a populous city of the State, with authority to build a market house and town hall, is a grant of a public character, and should be liberally construed to effectuate the designs intended to be accomplished by it. Per ARCHER, J.

The acts of the State prior to 1828, ch. 129, required persons vending lottery tickets to be licensed, and imposed penalties upon those violating the laws in relation to lotteries. The act of 1838, ch. 323, appointed commissioners by name, and authorised them to sell schemes and tickets of lotteries, exempting them from any tax whatever. The vendors of tickets under the authority of the commissioners, are not obliged to take out a license, nor subject to a penalty for a sale without a license. Per ARCHER, J.

Where the city of Baltimore acquired an interest in a public grant, surrendering, according to its provisions for public purposes, important rights of property, an attempt to tax the privileges secured by such grant, would be a violation of contract. Per ARCHER, J.

A license required to be obtained by the payment of money, is a tax. Per ARCHER, J.

The lottery system with a tax on dealers, are revenue laws. Per ARCHER, J.

In any grant of power or authority, all that is necessary to the enjoyment of

the grant, and to perfect its objects, are necessarily and impliedly granted likewise; and so when an agent is necessary to carry on the power, the right to appoint will be implied. Per ARCHER, J.

APPEAL from *Chancery,* under the act of 1835, chap. 346.

The bill in this cause was filed on the 7th July 1841, and on behalf of the *State of Maryland, Josiah Bayly Esq.,* Attorney General of the said State, at the suggestion of *Michael McBlair and George Cooke,* the State's Commissioners of Lotteries, that by an act of Assembly passed at December session 1838, entitled an act in aid of the construction of a State Armory and Town Hall, in the city of *Baltimore,* and the re-building and improvement of the Hanover Market House in said city, and by two supplements thereto passed at December session 1839, *Samuel Lucas, William Gwynn, George G. Belt, Charles F. Mayer, Charles G. Ridgley and Oliver Holmes,* (the last named appointed by the Mayor of *Baltimore* city by virtue of said acts, in the place of *Solomon Hillen, Jr.* originally named in the act of 1838,) were appointed commissioners with power and authority by a scheme or schemes of lottery, and the sales thereof, or of the tickets therein, to raise the sum of $225,000, free and clear of all expenses, and that the schemes of lotteries which have been submitted for approval under said acts, to the State Lottery Commissioners, and been by them approved, amount in all to eleven million nine hundred and eighty-three thousand one hundred and forty-six dollars, all which said schemes have been drawn by the said Commissioners of the State Armory and Town Hall Lottery grant, or by their agents or assignees, and that in addition thereto, the said Commissioners of the State Armory and Town Hall Lottery grant, have drawn five other schemes of lotteries under said grant, (none of which have been approved by the State Lottery Commissioners, and one of which has never been submitted for approval,) amounting to one million four hundred and fifty-three thousand two hundred and twelve dollars, making in all thirteen million four hundred and thirty-six thousand three hundred and fifty-eight dollars, as the total amount of the schemes which have already been drawn, under the said act of 1838,

and the supplements thereto.   Further informing sheweth to
your honor the said Attorney General, that the prizes in each
of the schemes above mentioned, amounted to the sum which
would be raised by the sale of the whole of the tickets in such
scheme, and that each and every ticket issued in each of said
schemes, contained upon its face a stipulation, that the holder
should submit to a deduction of fifteen per cent. from such
prize as it should draw.   Further informing sheweth to your
honor the said Attorney General, that fifteen per centum on the
amount of all the schemes drawn as aforesaid, produces a sum
of money, very far exceeding the sum authorised to be raised
by the act of Assembly of 1838 aforesaid, and its supplements,
even after the most ample deductions for expenses, charges and
interest, and that the lottery privileges by the said acts grant-
ed, have by the drawings of said schemes, been fulfilled, ex-
hausted and extinguished.   Further informing sheweth to your
honor the said Attorney General, that the said *Lucas, Gwynn,
Belt, Mayer, Ridgely and Holmes,* propose and offer to draw in
the city of *Baltimore,* two schemes of lotteries, one on the 8th
day of July 1841, and one on the 10th day of July 1841, each
purporting to be authorised by the above mentioned act of As-
sembly of 1838, and the supplements thereto, as appears by
certain handbills published and circulated by said Commis-
sioners of the State Armory and Town Hall Lottery, copies
of which are herewith filed as part of this information, marked
exhibits 1 and 2, and which said two schemes have never been
submitted for approval to, or approved by the State Commis-
sioners of lotteries.   Further informing sheweth to your honor
the said Attorney General, that *Michael McBlair* and *George
Cooke, esquires,* the State Commissioners of lotteries for the
present time being, believe that the two schemes of lotteries
proposed and offered to be drawn as aforesaid, are unautho-
rised by the laws of this State.   All which actings and doings
are contrary to equity and good conscience, and tend to the
injury of the State of Maryland.   In tender consideration
whereof, and for as much as the appropriate remedy in the
premises is in equity, to the end therefore that the said *Samuel*

*Lucas, William Gwynn, George G. Belt, Charles F. Mayer, Charles G. Ridgely and Oliver Holmes,* may full, true and perfect answers make, upon their several and respective corporal oaths to all and singular the premises, and that as fully as if they were thereto particularly interrogated, and especially that they may state, &c., and may be perpetually enjoined and restrained from proposing or offering to draw, or drawing or disposing of any scheme or schemes of lotteries under or by virtue of the acts of Assembly aforesaid, and that your informant may have all such other and further relief in the premises, as the case herein set forth may require.

The said Attorney General prays, that the court here will grant as well the State's writ of injunction (pursuant to the directions of the 21st section of an act of Assembly passed at December session 1828, chap. 127, entitled "a supplement to an act entitled an act to amend the lottery system") to the said *Samuel Lucas, William Gwynn, George G. Belt, Charles F. Mayer, Charles G. Ridgely and Oliver Holmes,* to be directed, strictly commanding and enjoining them, their servants and agents, from proceeding in the drawing of the two lotteries, or either of them, by them offered and proposed to be drawn, on the 8th day of July 1841, and the tenth day of July 1841, and from selling or drawing any scheme or schemes of any lottery or lotteries under and by virtue of said act of Assembly, passed at December session 1838, and the supplements thereto, until their right so to do can be determined, and also the State's writs of subpœna to the said *Samuel Lucas,* &c., then and there to answer the premises, and to stand to, perform and abide by such order, direction and decree therein, as to your honor may seem meet, &c.

This bill was sworn to by *George Cooke,* one of the State Commissioners of Lotteries.

Exhibits No. 1 and 2 were filed with the said bill. The Chancellor (BLAND,) ordered an injunction as prayed on the 7th July 1841.

The joint and several answers of *Samuel Lucas, William Gwynn, George G. Belt, Charles F. Mayer, Charles G. Ridgely*

*and Oliver Holmes,* all of the city of *Baltimore,* to the bill of complaint of information of *Josiah Baily* as Attorney General of *Maryland,* on behalf of the State of *Maryland,* exhibited in this court.

The respondents, reserving to themselves every exception to, &c., nevertheless for answer thereto say, that they admit they are Commissioners of the State Armory and Town Hall Lotteries, appointed by the act of *Maryland* of 1838, chap. 323, and the supplementary acts of 1839, chapters 52 and 93, or under the authority of said laws, and are duly qualified to act as such, and they refer to said acts and pray that the same may be taken and considered as a part of this answer,,as fully as if they were here at large set forth. Your respondents further admit, that the schemes of lotteries submitted by them to the State Lottery Commissioners for approval under the provisions of the said original act of 1838, chap. 323, amounted in the whole to the gross sum of about thirteen millions four hundred and thirty-six thousand three hundred and fifty-eight dollars, and that said schemes have been drawn either directly by respondents under said laws, or by a certain firm of the *Messrs. Gregory and Company of New Jersey,* to whom your respondents, under the power of sale vested in them by such laws, disposed of twelve of such schemes. Your respondents also admit, that since the first drawing of the schemes so approved by the State Lottery Commissioners, as aforesaid, and for reasons hereafter to be stated, they have drawn again five schemes, but not, as stated in the information, schemes which had never been approved by the State Commissioners, or presented to them for their approval, but on the contrary, were five of the schemes approved, as stated by the information by said commissioners, the said five drawings being only re-drawings of the same. Your respondents further admit, that when said information was filed, it was their purpose to draw on the 8th of this present month of July, and on the 10th of the same month, two other schemes under said Town Hall grant, but they deny that such schemes were never presented to, or approved by said State Commissioners, and on the contrary aver, that like the five just

above referred to, the said two schemes were another portion of the schemes approved by these officers. Your respondents further answering admit, that the prizes in each of the schemes so drawn as aforesaid, are equal to the whole amount of the sales of all the tickets in such schemes, if the whole are so sold and the proceeds all realized, and that each ticket therein so offered for sale under such schemes, was made upon its face subject to a deduction of fifteen per centum upon such prize as it might draw in such scheme; and of course they admit, that fifteen per centum upon the gross amount of the schemes aforesaid, if received, would amount to a much larger sum than two hundred and twenty-five thousand dollars, after deducting every expense to which respondents have, as commissioners aforesaid, been subjected, for it would amount to two million fifteen thousand four hundred and fifty-two dollars and seventy-cents. (2,015,452.70.) But your respondents further answering say, that so far from having sold all of the tickets in the schemes aforesaid, and received the proceeds thereof, and raised the said sum of $2,015,452.70, as they would have done upon that contingency, twelve of the said schemes, amounting in the gross to five million one hundred and eighty-two thousand one hundred and twenty-five dollars and fifty-five cents, (5,182,125.55,) thus sold as hereinbefore stated, to the house of *Messrs. Gregory & Company*, and received from that house in full therefor but the sum of ten thousand seven hundred and seventy-five dollars and forty-seven cents, as they believe was known to said State Commissioners named in the information, *Messrs. McBlair & Cooke*. And your respondents further answering say, that the said purchasers of such lotteries, so far from having sold all the tickets in the same, and realizing as in that event they would have done, fifteen per centum upon the same, less the said amount paid by them to respondents, actually made upon said schemes but about two thousand dollars, as appears by a letter from that house to one of the respondents, and prayed to be taken as a part of this answer,—your respondents being willing and offering to produce the original when required by your honor. Your

respondents further answering say, as is indeed already shewn, that notwithstanding the amount of said schemes was as aforesaid well known to said Commissioners of State Lotteries, as so sold to *Gregory & Company*, and that fifteen per centum thereon would exceed by a larger amount the sum authorised to be raised by your respondents under the said act of 1838, and its supplements, the State Commissioners proceeded until lately, to approve the further schemes under said grants, and never intimated the ground now assumed by them, as stated in the information, or that the said grant was exhausted, nor even applied to the respondents to ascertain what their expenses have been, but on the contrary, went on to approve such schemes without questioning the right of respondents to draw further schemes under said grant; and the respondents further answering deny, that the lottery privileges granted to them as aforesaid, have been fulfilled and exhausted by the drawing of the schemes aforesaid, by the drawing whereof they are charged by said bill to have fulfilled and exhausted said privileges. And these respondents deny, that they have raised by their schemes of lotteries and sales thereof, and by sales of tickets therein, more than the sum of twenty thousand dollars, free and clear and over and above all expenses and charges and interest, and they aver, that the whole gross sum so raised does not exceed said sum of twenty-thousand dollars, which gross sum, after deduction for all expenses and charges and interest (which expenses have been greatly incurred by the conduct of the State Lottery Commissioners) will not, these respondents aver, leave a larger amount than twelve thousand dollars.

Further answering respondents say and aver, that the whole amount of the sales of tickets made by them and their agents in the said twenty-six schemes drawn by themselves, was only fifty thousand two hundred and twenty-three dollars, upon which they realized only about the sum of two thousand dollars, after the payment of prizes and expenses chargeable against the same, which are about five thousand dollars, a particular account of which they will give your honor if the same should be deemed necessary. And your respondents further

answering say, that at the time the said grant was made, as *now* the object of the Legislature was to obtain in fact, and not by *construction* and *fiction*, the full sum originally contemplated, one hundred and fifty-thousand dollars, afterwards by the supplementary act enlarged to two hundred and twenty-five thousand dollars, for the accomplishment of the purely public purpose apparent on the face of the grant itself, the rebuilding of the Hanover Market House in the city aforesaid, and in connexion with the same the construction of a building as a Town Hall and State Armory, the latter of which was to be for the use and under the control of the State of Maryland; there was no private interest associated with the said grant, either to your respondents, or any one else, but on the contrary, as just stated, the sole object was the benefit of the State and the city aforesaid.

And your respondents contend, that the construction now urged by this information, if sanctioned, will utterly prostrate the purpose of the Legislature, and never could have been intended by them, since at the time said grant was given and enlarged, the reports of the State Commissioners to that body, or to the Executive, and known to the Legislature by communication from the Executive, shewed that the private contractors of the State Lotteries purchasing for their own profit, and interested of course in advancing schemes to the best advantage, were, and had ever been able to sell but a comparatively small number of tickets in each scheme.   This will appear by an official letter from the State Commissioners dated the 31st December 1840, to His Excellency Governor Grason, and by him laid before the Legislature, and prayed to be considered a part of this answer.

And your respondents further answering say, that the contractors stated in said letter, were also the purchasers of certain consolidated lotteries, being *private* grants, consolidated under the provisions of an act of Assembly in that behalf, and that of these grants there remained, as appears by such letter of such as were called old, to be then raised, but the sum of $12,900.43, and of the two recent ones therein mentioned, fifty

thousand dollars, and yet notwithstanding the ground now assumed by the State Commissioners as set forth in this information, that the amount raised in contemplation of such grants, is the stipulated per centum upon the prizes, or in other words, upon the gross amount of the schemes, the said Commissioners have, since said letter, approved from time to time twenty-six schemes under the said consolidated grants, amounting in the whole to five million six hundred and ninety-eight thousand five hundred and eighty dollars, and are now daily approving further schemes therein, and otherwise officially assisting said contractors in the drawing of the same.

Your respondents further allege, that before taking the ground now relied upon, that the grant of 1838, and its supplements, was exhausted, not by the respondents having in fact raised the sum of two hundred and twenty-five thousand dollars, "free and clear, and over and above all expenses and charges and interest whatsoever," but that it was constructively done. The said State Commissioners insisted, that your respondents, although they were expressly exempted by the law itself from any tax whatsoever, in the selling of tickets in the schemes they might draw, were not authorised to sell by agents who were not licensed to vend lottery tickets under the general laws of the State, and for the purpose of putting an end to such agencies, without which the grant would be virtually nugatory, they set on foot certain proceedings, which after came into *Baltimore* county court against certain persons for selling, as agents of respondents, and without being licensed as aforesaid, tickets in their said lotteries. Upon a full hearing of said proceedings, said court decided in favor of the said agents, and upon the ground that it was not the intention of the Legislature that the said grant should be subject in its execution to said license laws, as will appear by a printed copy of the opinion of said court, and prayed to be taken as a part of this answer.

It was not, your respondents further answering say, until that decision was heard, and after promising to approve further schemes for respondents under said grant, for several days thereafter, that the said Commissioners, contrary to their prior

conduct, and to their course then and since pursued in the case of the consolidated lotteries, decided against approving such other schemes, not because they were in themselves objectionable, but because the grant was exhausted for the reasons set forth in the information, and not because the $225,000 were in fact raised, or that any sum at all adequate to effect the improvement designed to be made by the grant, was so raised by respondents.

Being thus placed in the situation of abandoning the entire work, and seeing the will of the Legislature wholly frustrated, and the interest of the State and the city of *Baltimore* intended to be promoted by said grant, sacrificed, your respondents at once resorted to the only immediate resource left them, that of proceeding to redraw the schemes which had been partially drawn as aforesaid, until by actual sales of the tickets in such schemes, and not by constructive sales, they should be able actually to raise for the purpose of the improvement of the Town Hall and State Armory aforesaid, &c., the sum of two hundred and twenty-five thousand dollars, free, and clear and above and over all expenses, and so forth, and in this purpose they were engaged when arrested by the injunction issued by your honor upon the present information.

In conclusion your respondents further answering, aver and insist, that the grant in question of 1838, was not designed to be subject to any portion of the general lottery system, except so far as the provisions of that system are expressly referred to by it, and they must respectfully insist, that it is not especially liable to the provisions of the third section of the act of 1828, ch. 129, upon which as they understand, the present information is alone founded, because first, that section is wholly retrospective, applying altogether to then existing grants, and because secondly, to apply it to this grant, would be to defeat the State herself in the great public object, which it was her purpose by that grant to accomplish, they therefore pray, that the injunction issued upon the information be dissolved and they be dismissed, &c.

The answer was sworn to by all the defendants. The seve-

ral exhibits therein referred to were filed, but the reporters only consider it necessary to publish the opinion of ARCHER, Judge, in the case of the *State vs. Roberts,* decided by *Baltimore* county court.

STATE *vs.* ROBERTS.—The act of 1821, chap. 232, prohibits the opening any office or place for selling tickets in any lottery whatever, unless there be a license.    The act of 1827, chap. 106, sec. 6 and 7, prohibits any occupant of a house from exhibiting thereat any sign or card that shall indicate that a dealing in lottery tickets is carried on, and all persons are prohibited from setting up any sign with the like indication, unless such persons should be licensed; and the act of 1828, chap. 129, sec. 6, contains the like prohibitions.    By the act of 1831, chap. 79, all persons offending against any law of the State having reference to the lottery system of the State, shall forfeit and pay the sum of thirty dollars.    The appellee in this case having been empowered by the Town Hall Commissioners, appointed by the law of 1838, which is entitled an act in aid of the construction of a State Armory and Town Hall in the city of Baltimore, and the re-building and improvement of Hanover Market House in said city, put up a sign indicating that at his office tickets in the lottery authorised by the last act were for sale, and he did actually sell tickets, as has been proven in this cause, without having any license from the State to do so.

The suit has been instituted under the law of 1831, to recover the penalty thereby imposed for a violation of the laws first adverted to; and the sole question in the cause is, whether the appellee, acting for the Commissioners in the Town Hall Lottery, is amenable to the penalty; or in other words, whether he has violated any of the laws of this State by the acts charged and proven against him; and this question is to be determined by the solution of the question, whether the law of 1838, authorising a lottery for a State Armory and Town Hall, so far as regards the present question, operated as a repeal of the laws above adverted to, which required licenses to be taken out by dealers in lottery tickets.

Whether the law of 1838 does operate such a repeal, is a question of intention, to be deduced from a just construction of the act. The act, to have the capacity of operating a repeal, must be repugnant to the former law, or it will be the duty of the court so to construe them, that they may stand together.

In determining this question, it may be important to inquire what is the nature and object of the alleged repealing law, for its construction may materially depend upon its character. A different rule of interpretation is applied in the construction of private grants and one for the public. In private grants, should any ambiguity arise, the construction is to be in favor of the State, but in public grants or grants for the benefit of the public, a different rule of interpretation should be applied. The rule of interpretation in each case though variant, is founded on the same principle; which is the public interest and benefit.

The act of 1838 had several objects in view, all of a public character—such as the erection of a State Armory and apartments for military drill, confined not alone to militia of the city, but other military corps, and subjecting such building to the legislative control of the State, or in the language of the act, the Commissioners are to build above the Hanover Market, or otherwise in connexion with the same, a hall suitable for a State Armory, and for military drilling, and such other apartments for public purposes, and all such structures and contrivances for alarm bells, and signals for fire, as they may deem proper to construct. The above objects are all of a public character in which the State have a deep concern, as they are all connected with the safety of her citizens either in time of war or peace. There are other objects to be gratified by the law, which rather belong to the municipal corporation, an arm of the government, than to the government itself, such as the erection of a Market House and Town Hall.

Such being the public character of most of the objects designed to be accomplished by the law of 1838, we are most clearly of opinion, that it should be liberally construed to effectuate the great design or intention to be accomplished by the law.

With this rule of construction for our guide, we shall proceed to examine the questions presented to our consideration.

The anterior laws had required licenses to be granted to dealers in lottery tickets, and had imposed a tax of five per cent. on the prizes.

The law of 1838 appointed Commissioners by name, and invested them with power to sell, to raise $150,000 by the sale of a scheme or schemes of a lottery, and the sales thereof or of the tickets therein, and without being subject to any tax whatever, which sum they were authorised to raise free from all expenses, charges or interest whatever. The commissioners were to give bond to perform their duties under this law, and they are furthermore empowered to sell the schemes, and the vendor and his assignees are vested with the same rights and privileges as the commissioners. Now two questions have been raised and most elaborately discussed under this law—whether,

1st. The commissioners could sell tickets in this lottery themselves, without taking out any license, as required by the anterior laws, and

2nd. Whether they could appoint agents, with power to sell tickets, without obtaining a license.

As to the first question, whether the commissioners possess the power to sell without a license being first obtained—it is not necessary for us to determine whether after the passage of the law it would be competent for the Legislature to enact a law imposing a license or a tax on the commissioners, none existing at the time of the law. But we may be permitted to say, that in such a case, if the city of *Baltimore* have assented to the law according to its provisions, she has acquired an interest in her corporate capacity in the grant, which we think the Legislature could not impair, and if she have acquired an interest in the grant, by the surrender of important rights, as by surrendering her property in part for public purposes and assenting that her Market House shall be pulled down, any attempt to impose a tax even in the form of a license, would impair the contract, and would violate it upon the same principle

as did the imposition of a license fee on the importer who sold by the package, violate the Constitution of the United States. (*Brown vs. State of Maryland,* 12 *Wheat.* 419,) or the tax laid by the State of Ohio on the operation of banking in that State by the late Bank of the United States—(*U. S. Bank vs. Osborne,* 9 *Wheat.* 739.) It is true it was there a question of power between two governments. It would likewise be a question of power whether the State government could impair her grant, and if in the former case she were prohibited from impairing or defeating her concession of power by imposing a license or a tax, she would be equally prohibited from impairing her grant to the corporation.

But the State has imposed no license or tax since the passage of the law, and the only question is, whether the anterior laws operate on the commissioners.

It must be remembered that the commissioners act gratuitously, without any compensation whatever. Could the State have intended to make these commissioners lottery brokers during the long period this grant may endure, and it is said it may last twenty years, and probably will; to change their occupations, to give bonds to do their duty, which would be to sell the tickets until the object should be completed, and that without compensation; such must have been the intention if they are compelled to take out license, because under the license no one else could sell.

Again, could the State have intended that the commissioners should advance the amount of the license money out of their own pockets to subserve the public benefit, and wait until they could be indemnified by receiving money from the sale of schemes and tickets? We think not.

But what are the words of the law? The substance of the words is this, that the commissioners shall not be subject to any tax whatever. The words are as strong as they well can be made: they are not that they shall be subject to a tax, but to any tax; and to make it as strong as language can make it; they go further and say, it shall not be subject to any tax whatsoever. Now looking to these expressions as containing a

personal exemption from taxation, was not the design manifest, by the existing laws, there was then no personal tax but the license tax; did they refer to that or to some future personal tax. It is said they did not refer to the license, for that a license is not a tax within the meaning of that term. Now the law of 1821 expressly call it a tax—and the law of 1826 recognizes it as a tax; indeed they could not have done otherwise. Congress possessing power to lay taxes, under that power impose taxes by licenses—as for example during the last war, taxes in the shape of licenses were granted to carriage owners and to distillers, and we impose taxes on ordinary keepers, or hawkers and pedlars, by compelling them to take out licenses. These are extraordinary taxes laid upon occupations, and are treated by all lexicographers, legal and otherwise, and by writers on the wealth of nations, as taxes.

That a license is a tax, is too palpable for discussion, and comes within the terms of the law, unless there is something in the idea that it is a political or police regulation, intended to preserve, maintain and regulate the lottery system. If it were purely so there might be some weight in the argument, but it is not, it still has upon it the brand of tax impressed upon it by the first law.

It is true, the act of 1828 required the dealers in lottery tickets to give bonds, but this does not alter or vary the question. The design of this was only in aid of the general prohibition. The same obligation not to violate the laws existed, when the first tax law in relation to a license was proposed, as existed after the bond was given; the bond was purely to protect the revenue. The truth is, that the whole lottery system, together with the tax on dealers are revenue laws and nothing else, and we hazard nothing in saying, that but for the amount produced and the necessities of the State, the whole system would long since have been condemned as a nuisance.

But if it be the kind of regulation contended for, it is only so in part. It must be conceded, as it has been, that it is in part a tax, and if it be, no matter what may have been the other design or object, still it is a tax, and comes within the terms, any tax whatever.

Again, could it have been the intention of the Legislature to make the Lottery Commissioners pay the same for a license for vending Town Hall tickets as other venders have to pay for selling all kinds of tickets in all the lotteries authorised by the State? If so, this would be a most unequal tax, and would operate great injustice, and we are not to attribute such injustice to the Legislature.

Upon every view of this subject we think the commissioners might sell tickets without obtaining a license. We proceed to examine the second question.

Have they the power to appoint agents to sell without license? That they have power to appoint agents has not been denied, indeed could not be denied, because in any grant of power or authority, all that is necessary to the enjoyment of the grant and to perfect its objects, are necessarily and impliedly granted likewise; without such implied power the grant would be nugatory, and would have been more especially so in this case, because the persons appointed, from their occupations and habits, and from the character of the grant, could never have carried it into execution without the intervention of agents equally well skilled with those who sell and have been in the habit of selling under a license.

All grants of this description are necessarily carried out by the intervention of agents peculiarly skilled in forming schemes, in selling tickets, and in all the arcana of that trade.

But must they take out a license; and here again we would ask, must the commissioners employ those already licensed? They may refuse; they may if they please by such refusal defeat the grant.

Must they buy licenses for their agents? We answer it would be unreasonable to say the Legislature intended them to buy licenses by advancing money for perhaps ten fifteen or twenty agents, at an expense of several thousand dollars, and when they purchase them the tax is unequal, for it is only to sell Town Hall tickets.

Again, would agents buy a license to sell these tickets alone? Contracts might never be formed, if, as a preliminary, these agents are to purchase general licenses.

If the agent sell, it is but the sale of the principal, and it must upon our construction be free from a tax—for it is a tax whether the agent take the license or the principal.     The contract is one of clear agency, by the very terms of it, and the mode of compensation does not change its character.

But it is said this is a most dangerous and enlarged power, it overturns the whole lottery system.     We might answer, that was for the consideration of the Legislature; we must be governed by the terms they have used; but why should we not contend the Legislature to have made this grant to this extent.

The lottery system is for revenue.     The State Armory is a great State object and must be built, and the State is not able to appropriate $150,000 for that object.     In this State of things they only say, we will from year to year take so much from our lottery system to accomplish a great State object.     This is the inference we draw from the act of the Legislature, and we think it is a just and legal inference, and in so deciding we think we further their views as disclosed by their acts.

In conclusion, we think the appellee has committed no offence against the laws of this State, as the anterior laws porhibiting the sale of lottery tickets, or the dealing therein, is repealed so far as regards the Town Hall Lottery, by the law of 1838, and that the Town Hall Commissioners, and their duly authorised agents, possess full power by this law to sell tickets in the lotteries designated by that law, without obtaining any license whatsoever.

The defendants then petitioned the Chancellor to appoint an early day for the hearing of the matters in controversy, which petition was dismissed, and the complainants filed in court exceptions to the answer of the said defendants.

1st. For that whereas it is positively alleged, in and by said bill and information, that the said defendants proposed and offered to draw in the city of *Baltimore,* two schemes of lotteries, one on the 8th day of July 1841, and the other on the 10th day of July 1841, each purporting to be authorised by the act of 1838, therein referred to, copies of which said schemes are filed with said bill and information as Exhibits 1

and 2, and although the said defendants, in and by their said answer, admit that it was their purpose, when said bill and information was filed, to draw on the 8th and on the 10th of said month, two schemes under said act, yet they do not, in terms, admit nor deny, whether the said two schemes, by them so proposed to be drawn, were or were not the said two schemes of which said exhibits are copies.

2nd. For that whereas it is positively alleged in and by said bill and information, that besides drawing certain approved schemes, the said respondents had drawn five other schemes of lotteries under said grant, (none of which had been approved by the State's Lottery Commissioners, and one of which had never been submitted for approval,) and although the respondents admit, that since the first drawing of the schemes so approved by the State Lottery Commissioners, they have drawn again five schemes, but not, as stated in the information, schemes which had never been approved by the State Commissioners, or presented to them for their approval, but on the contrary, were five of the schemes approved by said commissioners, the said five drawings being only re-drawings of the same; and although the said respondents do thereby admit that the said five schemes were all and each of them drawn the second time, yet it is not admitted or denied, directly or in terms, whether or not the said re-drawings or second drawings, were with the approval, or without the approval of the State Lottery Commissioners—nor whether the said schemes respectively were or were not of such construction that one drawing would necessarily determine the fate of all the tickets therein—or whether or not the said schemes were of such construction that one or a first drawing thereof would only partially determine the fate of the tickets therein—nor whether the said first drawing was a full and complete drawing, or only a partial one; and if partial, in what respect, and how in certain,—nor whether the said re-drawings or second drawings of said five schemes were full drawings thereof, or only partial drawings thereof—and whether in the first drawings of said five schemes, any prizes were drawn or not, and if any, whether

in the said re-drawings the same, or any of the same, prizes were drawn or not, and whether, previous to such first drawing, any tickets were sold or not in the said schemes; and whether, the same tickets, or any of the same tickets, were considered or were not considered as embraced in said schemes, when the same were, as alleged, re-drawn by said respondents, so that the said answer in these respects is uncertain, evasive, and insufficient.

3rd. For that whereas, although it is positively alleged in and by said bill and information, that the said respondents proposed to draw two schemes on the 8th July and 10th July 1841, which said two schemes it is therein further alleged, had never been submitted for approval to, or approved by the State's Commissioners of Lotteries; and although the said respondents in one part of their said answer, to wit, on the fourth page thereof, deny that such schemes were never presented to, or approved by said State Commissioners, and on the contrary aver, that like other five schemes in said answer referred to, the said two schemes were another portion of the schemes approved by those officers, and although in another part of the said answer, to wit, on the sixteenth page thereof, *et sequentibus*, it is stated, in effect, that the State Commissioners did decide against approving further schemes, on the ground that the grant was exhausted, and that respondents at once resorted to the only immediate resource left them, that of proceeding to redraw the schemes which had been partially drawn, until, by actual sales of the tickets in such schemes, and not by constructive sales, they should be able to raise said sum of two hundred and twenty-five thousand dollars, free and clear and above and over all expenses, &c., and that they were engaged in this purpose when arrested by the injunction in this case. Yet it is not stated with any certainty whether the said two schemes, proposed to be drawn on the 8th and 10th of July respectively, had been, or had not been, submitted to the State's Commissioners for approval, as original schemes proposed to be drawn on said days respectively, and whether the same had been, or had not been, approved by said commissioners as ori-

ginal schemes proposed to be drawn on said days respectively; or whether either of them had so been approved or not; and if upon the true interpretation of said several parts of said answer, it is to be understood as sufficiently alleged that the said two schemes intended to be drawn on said 8th of July and said 10th of July respectively, were re-drawings of schemes which had been submitted as proposed to be drawn on certain days then past, and which had been approved by said commissioners as schemes so proposed to be drawn on certain days which have since passed; yet it is not stated with any precision or any certainty, express or demonstrable, whether the said schemes so proposed to be drawn on said 8th and 10th of July, were full schemes or only parts of schemes; that is to say, whether the said scheme of the 8th July, and said scheme of the 10th July, were respectively the exact counterparts of schemes which had been approved by said commissioners, with no other alteration except the substitution of the said respective days in lieu of other and different days, or whether the said schemes were only remnants of schemes which had been approved by said commissioners, for other days, and which had only been partially drawn on such other days, and the residue and undrawn parts whereof, and no more, were intended to be drawn on said several days respectively; and if exact counterparts, it is not stated whether, at the first drawing thereof, any tickets were sold or not, and if any, whether any prizes were drawn or not by the holder of such tickets, and whether the said drawing was a full and complete drawing so as to determine the fate of all tickets, sold and unsold in said scheme or not, and if not, to what extent, and if only remnants of schemes, then whether the same did not purport to decide the fate of all tickets, and to dispose of all the prizes in said original schemes, respectively or not. In all which particulars said answer is very uncertain, evasive and insufficient.

4th. For that so much and all such parts of said answer as relate to the consolidated lotteries, commencing at page twelve of said answer, towards the bottom of said page, at the words "and your respondents further answering say, &c." down to

the end of the seventh line from the top of the fourteenth page of said answer, are and every portion thereof is, impertinent to the matters in controversy in the cause.

5th. That so much of said answer, as relates to the right claimed by respondent to sell tickets, without license, by agents, beginning at the words "your respondents further allege," on the fourteenth page, and continuing down to the end of the eighth line on the sixteenth page inclusive of the Exhibit C filed with said answer, is, and the matters therein contained are, wholly impertinent to the merits of this case, and the matters in controversy in this cause.

6th. For that said answer is, in other respects, informal, defective and insufficient.

And afterwards, to wit, the defendants filed in court their amended answer in the words following, to wit:

*Attorney General,* in behalf of the State of *Maryland,* at the relation of *M. McBlair and George Cooke, Commissioners, vs. Lucas, Gwynn and others. In Chancery.*

The defendants agree to amend, and with the consent of the *Attorney General,* do hereby amend their answer in the following particulars.

1st. In answer to the first exception, the respondents admit, that Exhibits 1 and 2 of the information, are exact copies of the several schemes, proposed by these respondents to be drawn, as set forth in said information, on the 8th July and on the 10th July respectively, as expressed on the face of said exhibits.

2nd. In answer to the second exception, the said respondents say, that the said five schemes, referred to in said exception, are exact counterparts of schemes which had been originally submitted by these respondents to the State's Commissioners of Lotteries for approval by them, as schemes to be drawn by these respondents under said act of 1838, chap. 323, and its supplements, and which said schemes, originally submitted, were approved by said State Commissioners as schemes to be drawn on certain specified days, and which said schemes were afterwards drawn by these respondents on the said several specified days appointed, in that behalf, by said

State Commissioners; that said schemes were all constructed on the combination system, precisely in like manner as the schemes produced as Exhibits 1 and 2 of the information—and that said several schemes were drawn, by putting into the wheel the whole of the numbers used in combination in the construction of said schemes, and by drawing therefrom such a number of tickets, as upon the principles of construction of such schemes respectively would, and did decide the fate of all the tickets therein—that tickets were sold in each of said schemes before the original drawings thereof, but not the whole amount of re-tickets in said several schemes, or the whole amount of the tickets in any one of the said schemes, or any considerable part of the tickets in any of said schemes; that prizes were drawn by some of the tickets, so sold, in each of said several schemes, so drawn by these respondents, that the said five schemes were re-drawn, or drawn the second time by these respondents, without any new or second approval thereof by the said State Commissioners, and on certain days appointed in that behalf by these respondents, without the approval in that behalf of said State Commissioners, and without application to the said State Commissioners in respect of one of said schemes, for their approval in that behalf, that in the re-drawings or second drawings of said five schemes, no deduction was made for tickets sold prior to the first drawing of said schemes respectively for tickets sold in any of said schemes, nor any deduction for prizes drawn in said several schemes respectively, or any of them, but that said second drawings were the full and entire drawings of said several schemes respectively, without any alteration, except the substitution by these respondents as aforesaid, of different days, in each case, for the several days appointed for each scheme respectively, by the said State Commissioners, when they approved the said several schemes respectively.

3rd. In answer to the third exception, the said respondents admit, that the said two schemes, proposed to be drawn on the 8th July and the 10th July 1841, are exact counterparts of drafts, which had been originally submitted by these respon-

dents to said State Commissioners for approval, and which were approved by said commissioners, as schemes to be drawn on certain specified days, appointed in that behalf by said State Commissioners, and which said two schemes were afterwards drawn by these respondents on the said several days appointed in that behalf by said State Commissioners, and that prior to such drawings of said several two schemes, tickets were sold in each of said schemes, and that upon such drawings prizes were drawn by certain of the tickets so sold in each of said schemes; that said two schemes when drawn were drawn severally in every particular, in the same manner as the said several schemes, marked Exhibits 1 and 2, are proposed on their face to be drawn; that the whole amount of tickets in said several schemes were not sold prior to such drawings thereof, nor was the whole amount, nor *even* any considerable part of the tickets in either of the said schemes sold prior to the drawings thereof; that the said two schemes, marked Exhibits 1 and 2, were not submitted to said State Commissioners for approval again since they were so first drawn, nor was any application made to them to sanction their drawing on said several days, specified on the face of said exhibits on the drawing of either of them, on the said day specified on its face; that said days, to wit, the 8th of July and the 10th of July, were severally appointed by these respondents, without asking or obtaining the approval in that behalf of said State Commissioners.

On the 27th of July 1841, the Chancellor (BLAND,) passed the following order:

The exceptions to the answer of the defendants, and the motion to dissolve the injuction by consent, standing now ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.

Whereupon it is ordered, that the fourth, fifth and sixth exceptions to the answer of the defendants, not having been answered, the same are hereby sustained, and the impertinent matter therein specified and referred to, be, and the same is hereby rejected and expunged from the said answer; and it is further ordered, that the injunction heretofore granted in this

case be, and the same is hereby continued until the final hearings or further order.

The defendants prayed an appeal from the order of the Chancellor of the seventh of July eighteen hundred and forty-one, granting the injunction, and also from the order of the twenty-seventh of July of the same year, sustaining the fourth, fifth and sixth exceptions to the answer of the said defendants, and continuing the said injunction.

The appeal was argued before BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, and CHAMBERS, J.

By JOHN NELSON and R. JOHNSON for the appellants, and By J. N. STEELE and W. SCHLEY, for the appellees.

*Act of* 1838, *chap.* 323.   An act in aid of the construction of a State Armory and Town Hall in the city of *Baltimore,* and the re-building and improvement of the Hanover Market House, in said city.

Whereas, sundry citizens of *Baltimore,* propose to have constructed a State Armory and Town Hall, and other apartments for public uses, and to re-build and enlarge the Hanover Market House in said city, over or in connection with which Market House, it is contemplated to construct said Armory, Town Hall, and other apartments; and whereas, the said undertaking will subserve materially the public convenience and interests; and it is represented, that to accomplish these highly useful objects, adequate means cannot be procured, save through the privilege of a Lottery.   Therefore,

SEC. 1. *Be it enacted by the General Assembly of Maryland,* That *Samuel Lucas, William Gwynn, George Gordon Belt, Charles F. Mayer, Charles George Ridgely and Solomon Hillen, junior,* of the city of *Baltimore,* be and they are hereby appointed commissioners, with full power and authority, by a scheme or schemes of lottery, and the sales thereof, or of the tickets therein, and without being subject to any tax whatsoever, to raise the sum of one hundred and fifty thousand dollars, free and clear, and over and above all expenses, and charges, and interest whatsoever.

SEC. 2. *And be it enacted,* That the scheme or schemes aforesaid, shall be approved by the Commissioners of lotteries, or any one of them, before the same, or any tickets, shall shall be deemed to be authorised to be sold, and that before the said commissioners may sell as aforesaid, they shall enter into bond with sureties to be approved, and in a penalty to be fixed by said commissioners of lotteries, or any one of them, condition for the faithful discharge of their duty as commissioners, and for the due application for the purpose of this act, of the monies coming to their hands as commissioners, which bond or bonds shall be made to the State of *Maryland,* and be filed in the clerk's office of *Baltimore* county court, and may, on a certified copy thereof as evidence, be sued as other public bonds may, by any person or persons, or body politic interested in the condition thereof.

SEC. 3. *And be it enacted,* That the said commissioners appointed by this act, may sell for such sums of money as they may deem proper, the scheme or schemes aforesaid, and the purchasers thereof, and their assigns, shall have and enjoy all the rights and privileges in the disposal of the tickets in said schemes, and the raising money therefrom, as are by this act conferred on said commissioners; provided however, that before such purchasers or their assigns shall so avail themselves of said schemes, they shall enter into bond to the State of *Maryland,* with sureties to be approved, and in penalty to be fixed by said commissioners of lotteries, or any one of them, for the punctual payment of all prizes that shall be drawn to such tickets, and the bond or bonds shall be filed, and may be sued as provided in cases of said bonds of said commissioners, and said commissioners shall make report, verified by affidavit, immediately upon making the sale or sales of a scheme or schemes as aforesaid, particularly certifying the amounts and terms of such sales.

SEC. 4. *And be it enacted,* That the commissioners by this act appointed, shall (provided the assent of the Mayor and City Council of *Baltimore* be given this act,) have full power and authority to take down, and upon such plan and dimen-

sions as to them shall seem fit, to rebuild the Hanover Market House in said city; and above the same or otherwise in connection therewith, to cause to be constructed a hall, suitable for the State Armory and for military drilling and Town Hall, and such other apartments for public purposes, and all such structures and contrivances for alarm bells and signals of fire, as said commissioners may deem proper to construct; and in order to the enlargement of the site of said Market House, and otherwise for the objects aforesaid, the said commissioners may, in the name of and for the Mayor and City Council of *Baltimore*, purchase any grounds whatsoever, and the said commissioners to the purposes aforesaid, shall apply the nett monies aforesaid, accruing to them under and by virtue of this act; and when all said buildings and improvements shall have been completed, the same shall be surrendered by said commissioners to the Mayor and City Council of *Baltimore*, who are hereby authorised to pass all ordinances for the regulating thereof; provided however, that there be reserved for the use and control of the State of *Maryland*, such apartment or apartments in said buildings, as may be selected and designated by the Governor, for the purpose of an Armory for the service of the militia and volunteer corps of the city of *Baltimore*, or other military corps, and for a place of military drill, subject to such regulations as the *General Assembly of Maryland*, may from time to time enact, regarding the uses thereof aforesaid.

Sec. 5. *And be it enacted*, That when the said commissioners shall, in place of selling a scheme, sell the tickets therein, it shall be the duty of the commissioners to pay the prizes which may be drawn to such tickets, which obligation shall be deemed to be within the condition of their bond or bonds as aforesaid.

Sec. 6. *And be it enacted*, That any vacancies that may from time to time occur by resignation, death, declining to act, or any other cause in the board of said commissioners, shall be filled by the Mayor of the city of *Baltimore*, the persons appointed to such vacancies being however hereby required, be-

fore they shall be competent to act, to enter into bond, with sureties and condition, in penalty as prescribed by the second section of this act in regard to the commissioners herein named.

SEC. 7. *And be it enacted,* That this act and all the privileges, franchises and rights conferred hereby, shall expire and cease to be exercised at the expiration.of two years from and after the passage of this act.

*Act of* 1839, *chap.* 52. A supplement to the act of Assembly passed at December session eighteen hundred and thirty-eight, chapter three hundred and twenty-three, entitled an act to aid in the construction of a State Armory and Town Hall in the city of *Baltimore*, and the re-building and improvement of the Hanover Market House in said city.

*Be it enacted by the General Assembly of Maryland,* That the seventh section of the act to which this is a supplement, be, and the same is hereby repealed; provided however, that the privilege of drawing a scheme or schemes of lotteries conferred by said act and this supplement, shall cease so soon as by the drawing of the said schemes, the nett sum of two hundred and twenty-five thousand dollars shall have been raised; and provided, that nothing herein contained shall be construed to extend said privilege beyond the period when the existing lottery grants shall have expired.

DORSEY, J,. delivered the opinion of the court.

It is conceded in the argument of this case, and admitted by the answer of the appellants, that had all the tickets been sold in the schemes drawn under the act of 1838, chapter 323, and its supplement of 1839, chap. 52, confirming lottery privileges on certain commissioners therein named, a much larger amount would have been raised, than the sum prescribed in those acts of Assembly. But it is alleged by the appellants, that only a small portion of the tickets in the schemes drawn, were sold; and that the amount received by the commissioners from the schemes which they drew, and from those which were sold by them, and drawn by other persons, formed but a very small portion of the sum of $225,000, which under the acts

of Assembly, they say, they were authorised to realize, and they insist, that under the lottery privilege, they still have the right to continue the drawing or sales of lottery schemes, in the mode they have heretofore pursued, until they shall have actually realized the nett sum of $225,000. On the other hand it is contended, that the schemes already drawn under the sanction of the Town Hall Commissioners, have more than exhausted the lottery franchise. Upon the true construction therefore of the nature of the franchise conferred by the two acts of Assembly in question, and the powers given for its exercise and enjoyment, must mainly depend the determination of the matters in controversy in this case.

On the part of the appellants it is urged, that it was the intention of the Legislature, that the amount which the lottery grant proposed to raise should be actually raised; and that a failure to do so was not contemplated by the Legislature. From this abstract proposition we see no reason to dissent. But why was it that such was the legislative contemplation and intent? Because it assumed, that a sale would be made of all the tickets mentioned in the schemes drawn. It intended that the privilege granted should be fixed and certain; not as contended for in the argument, that it should fluctuate and change with the tide of good or ill luck, and expand and contract with the gain and loss of the wheel. When a scheme is drawn, the legislative assumption is, that all the tickets are sold; that the sum actually raised by the drawing was that which the scheme upon its face purported to raise. If then the owner of a scheme upon a sale of but part of the tickets, sees fit to draw it in contemplation of law, he is the purchaser of all the unsold tickets, and entitled to all the prizes they may draw. Should, therefore, for example, a scheme of a million of dollars (with the usual deduction of fifteen per cent.) be drawn, whilst one-half of the tickets remained unsold, and all the prizes, as by possibility they might be, were drawn by the unsold tickets, in the eye of the law, the lottery privilege would not by this tide of good fortune be thereby changed; the sum raised from it would be but $150,000, although the gross sum actually gained

by the owner of the scheme, would be $500,000. So on the other hand, had all the prizes come out to the tickets which had been sold, the sum raised in legal contemplation, by the drawing of the schemes, would have been the same, although the proprietor of the scheme would in fact have lost the sum of $350,000, in addition to the amount which he was to have raised by the lottery. To prove the legislative assumption, that all the tickets are sold, in the lotteries drawn under grants from the Legislature, we do not entirely rely upon the notoriety of the fact, that such lotteries were so drawn; but think it satisfactorily shown by reference to the provisions of some of the acts of Assembly in relation to such grants. All the grants in terms provide for the sale of the tickets and drawing of the lotteries; and not an intimation is to be found in any of them, which looks to a drawing of the schemes before the tickets are sold. By the act of 1816, chap. 259, entitled "an act for the encouragement of literature," managers were appointed to raise by lotteries to be drawn by them, the sum of $50,000 annually, for five years, for the increase of the school fund of *the State.* And the managers were required under the direction of the Treasurer of the Western Shore, to deposit in such Bank as he might direct, the monies by them received for the tickets sold, to be applied to the payment of prizes, &c. In case of any deficiency in the money so received, no other means were provided by which the prizes could be paid. In almost all the previous lottery grants, the only bond given to secure the payment of prizes, bound the commissioners or managers only to the application of the moneys received from the schemes drawn, to the payment of prizes. It is therefore for the reasons assigned in the opinion of the court in the case of *Phalen and Morris vs. The State of Maryland,* a matter of the clearest inference, that the Legislature contemplated a sale of all the tickets in the schemes of the lotteries drawn.

But we are not left to mere inferences to ascertain the meaning and design of the Legislature upon this subject, they have given us what is equivalent to an unequivocal declaration of their intention in this respect.

raise the sum authorised to be raised; that in all such cases, the power and authority given to raise money thereby, be and the same is hereby considered as completed, and the power to draw any other lottery or lotteries, under the same authority, be and the same is hereby declared at an end."

This enactment, though not in terms declaratory, yet such must be its judicial construction; and it must be regarded as of controling influence, in the ascertainment of the legislative will, in all subsequent acts upon such subjects. The act of 1817, chap. 154, was not only intended to provide for the raising of a revenue for the State, by the appointment of a board of lottery commissioners to draw schemes for that purpose, but it prescribed also, certain rules and regulations in respect to all other lotteries to be drawn in the State. By its 5th section it enacts, that the managers of all lotteries thereafter to be drawn, should first submit the schemes thereof to the said lottery commissioners, who were directed to approve the same, if not contrary to that act, or the law authorising the same.

By the *third* section of the act of 1828, chap. 129, it is enacted, "that in determining the amount which may be raised by lottery in virtue of any grant made by this State, the lottery commissioners shall not allow any deduction to be made from the sum of money, which any scheme of any lottery that shall be drawn under any such grant, shall purport to raise, because of any ticket or tickets or parts of tickets therein remaining unsold, at the time of drawing the same." With these enactments before us, and also the act of 1818, chap. 179, sec. 2, requiring a payment into the treasury, for the use of the State, of *five* per centum on the gross amount of prizes in every lottery before it is drawn; we were at a loss to conceive how any reasonable doubt could exist, as to the test by which the exhaustion of legislative lottery grants as to be ascertained; the amount which, in the contemplation of the Legislature, was raised by such scheme drawn, and the number of tickets to be sold previous to such drawing.

But it has been urged in the case before us, that the third section of the act of 1828, chap. 129, has nothing to do with

subsequent laws, relating only to pre-existing grants. From this interpretation of the 3rd section of the act of 1828, chap. 129, we entirely dissent. It prescribes a rule of conduct for the lottery commissioners in all future time, as well in its terms as in its nature and object, embracing future, as well as antecedent grants; and viewing it in connection with the two preceding sections of the act, we cannot be induced to doubt upon the subject. It is said there could have been no motive in making it operative on future legislation, as in every subsequent grant there might be inserted a similar provision. This suggestion makes no change in our opinion on the subject. We hold the provision to be wise and salutary; and upon the soundest rules of construction more unobjectionably and peculiarly applicable to subsequent, than prior enactments. It gives a uniform rule of construction embracing all lottery grants, not clearly exempted from its influence by the Legislature. It evinces a spirit of impartial legislation, worthy of all praise; and would present strong claims to our sanction, if recommended by nothing but its economical operation upon the time and expenditure of the General Assembly, and its prevention of redundancy in legislative enactments.

The argument of the appellant's counsel tends to the repudiation of all general statutory provisions operating on future legislation, in opposition to the opinions of the most upright and enlightened jurists. But even suppose the argument to be a sound one; that this section of the act of 1828, applied only to existing lottery grants, yet connecting it with the act of 1817, it furnishes such conclusive evidence of the legislative will, when acting on such subjects, that its influence on our opinion would not be materially affected.

Under the acts of 1817, chap. 154, sec. 5, and 1828, chap. 129, sec. 3, powers in their nature judicial, not merely ministerial, are conferred upon the lottery commissioners. And as a general proposition it is unquestionably true, that all schemes of lotteries thereafter drawn, whether under antecedent or subsequent legislative grants, must be submitted to them for their approval and determination, whether they are authorised by

law.  If the face of the schemes furnish not the test of exhaustion, and the owners thereof may at their pleasure, upon a sale of any portion of the tickets, draw the lotteries, and the lottery grant is only exhausted to the extent of the sum actually realized by the drawing, it is absurd to submit the determination of the authority to draw the scheme to the lottery commissioners, because they have no possible means of judging correctly on such a subject.  All the facts upon which their judgment should be founded, are sealed in the bosom of him who is interested in concealing them; and they have no authority given them to enforce their revelation.   To our minds it is clear, that the Legislature never contemplated the drawing of lotteries upon the sale of a small portion of the tickets, and that the standard of exhaustion was not the sum actually raised by the drawing, or they would have required of its owner, after the drawing of every scheme, a statement on oath, of the amount realized by such drawing.   It is also said, that the act of 1835, chap. 205, commonly called the consolidation lottery law, is conclusive as to their construction of the powers, given in all grants of lotteries by the Legislature; that act authorising the lottery commissioners to raise for the grantees, in the same manner that they raise money on the drawing of lotteries for the benefit of the State, the nett amount specified in each consolidated lottery grant.   We cannot give to the act of 1835, the effect imputed to it.   Its object was in no wise, to declare or recognize the rights created by the lottery grants previously to their consolidation ; but it was in effect, a bargain between the Legislature and those grantees, by which the accustomed mode of realizing the objects of those grants was changed, and new facilities afforded in consideration of which, those grants were withdrawn from all competition or conflict with State lotteries for revenue ; and what was a more prominent object with the Legislature, it was thereby enabled more speedily to consummate those lottery grants, and thus hasten the epoch they desired, of putting an end to all drawing of lotteries in *Maryland.*   To impute to the Legislature the design of conferring by implication on lottery grantees, not com-

ing in under the act of 1835, and on all subsequent grantees of lottery privileges; the benefits of that act of Assembly is, we think, a construction which has nothing but its novelty to recommend it, and is in manifest conflict with the intent of the Legislature. Some stress has been laid on the alleged peculiarity of the phraseology of the *first section* of the act of 1838, which appoints commissioners with authority by a scheme or schemes of lottery, to raise the sum of $150,000. In all previous lottery grants, it is asserted, that the authority given is to propose a scheme or schemes to raise "the sums of money mentioned in the acts of Assembly." An examination of the various acts of Assembly conferring lottery privileges prior to 1838, shows, that this assertion is not sustained by the facts from which it is alleged to appear. By the act of 1809, chap. 63, for drawing a lottery or lotteries in *Middletown,* in *Frederick* county, commissioners are authorised, not as is said "to propose a scheme to raise," &c. but "to raise by lottery or lotteries at any place within this State, a sum not exceeding two thousand dollars." The act of 1809, chap. 150, appoints managers of a lottery, and empowers them, not as stated "to propose a scheme," &c., but "to raise eight thousand *dollars*." The same may be said of the acts of 1810, chap. 27—1811, ch. 54—and the acts of 1803, chap. 74, sec. 5—1804, ch. 100— 1807, chap. 42—1810, chap. 40—1811, chap. 148—1813, ch. 132—1814, ch. 116—1815, ch. 209, and other acts which might be referred to, are identical in terms, (if not stronger) with the act of 1838. And yet these acts of Assembly are so similar in their nature and objects, and all their provisions with those passed at the same sessions, in which the words "to propose a scheme, &c.," are used, that after carefully examining them, with a view to their true interpretation, we can arrive at no other conclusion than that, though the terms and expressions as to the raising of money by the drawing of lotteries are somewhat variant, yet that the same powers in this respect are, and were designed to be conferred under each act of Assembly. And this conclusion appears to us sufficiently obvious, even if the Legislature had not unequivocally so declared by the acts

of 1817 and 1828.   It is however contended, that conceding to the 3rd section of the act of 1828, the interpretation we have ascribed to it, the act of 1838, chap. 323, is *pro hac vice* a repeal of it.   And this constructive repeal has been based upon a variety of grounds.

*First,* it is said, that the preamble of the act of 1838, shews its object to be a great "matter of State and general, as well as city interest," and that its provisions must therefore receive such a construction, as will effectuate the accomplishment of that object.   We do not ascribe to this preamble of the act of 1838, that controling influence in expounding its enactments, which would give to them an import, wholly variant from that invariably given, for nearly fifty years, and indeed as far back as we can trace the subject upon our statute books, to all other lottery grants emanating from the Legislature of *Maryland.* The erection of such a structure as was contemplated, would, to be sure, subserve the public convenience and interest, but the interests of the State at large are quite as much concerned, and as deeply involved in the encouragement and promotion of christianity and education, (for which purpose numerous lottery grants have from time to time been made,) as they are in the erection of that gigantic structure, the diagram of which has been so imposingly displayed to our view.   Dispassionately regarding the subject, we cannot induce ourselves to believe, that the construction of this magnificent building, except in the imaginations of its projectors, is such a paramount object of State policy, of such vital importance to the republic; that the lottery grant made in aid of it, should on that account, receive a construction so fatal to the morality, acknowledged policy, and pecuniary interest of the people of the State, and at war with that given to every other legislative lottery grant, passed within the memory of man.

*Secondly,* it is asserted in support of the anomolous prerogative construction claimed for the act of 1838, chap. 325, that by its *first* section, all lotteries drawn under it are exempt from the payment of the five per cent. tax; a privilege or exemption, it is alleged, never before conferred in any lottery

grant made by the State. · And from this act of favor and munificence, the appellants claim an implied legislative transfer in the drawing of schemes under their act, of all the powers exercised by the lottery commissioners in drawing schemes in aid of the revenue of the State.

· We have not deemed it necessary to examine the numerous lottery grants, prior to 1838, to ascertain the truth of this allegation. But let it be conceded, what does it prove ? Nothing more than that the grant of 1838, should be exempted from the operation of that section of the act of 1818, chap. 176, which imposes a tax of *five* per cent. on all other than State lotteries. Is it a just inference from this partial limited exemption to this lottery grant, that it is therefore exempted from all other regulations, burthens and restrictions, which the acts of Assembly have imposed upon it in common with all others ? That because, by a special provision in the act of 1838, this grant has conferred on it one of the privileges or immunities of State lotteries; therefore it is entitled to the enjoyment of them all? Such a doctrine is novel, to say the least of it; and certainly does not harmonize with the well settled maxim of the law, that *"expressio unius est exclusio ulterius."* It has been decided by *Baltimore* county court, as is shown by the record, (and we mean not to intimate a doubt as to the correctness of that decision, the case not being before us,) that the vendors of the Town Hall lottery tickets are not bound to take out licenses under the act of 1831, chap. 79, as are those who sell tickets in lotteries, drawn for the benefit of the State; the grant of which licenses cannot be made for a less sum than $5,000.

The State lottery commissioners under the act of 1831, chap. 76, sec. 1, cannot sell schemes for the State, unless the purchaser thereof shall stipulate to pay to the State of *Maryland* during the year, at least $15,000; nor are they authorised to sell their schemes at a lower rate than five per cent., *on the amount of the tickets sold therein.* As then the appellant's counsel throughout their argument, disclaim all idea of a legislative design, in the passage of the act of 1838, to suspend

or materially impair the revenue of the State, derived from the sale of State lottery schemes; and claim only, that their schemes sold for the accomplishment of a State object should be placed on an equal footing, and in fair competition with State lottery schemes sold for the sake of revenue; can it on any pretence of reason, consistency or justice, be contended, that by a mere implication of the legislative intent, the State Armory and Town Hall lottery grant had bestowed on it, the privileges now claimed. If it possessed them, the inevitable consequence would have been, that until the grant was exhausted, not a dollar could have been raised by the sale of schemes for public revenue. What lottery dealer, acting upon those principles by which they are all governed, would buy State lottery schemes, and pay $5,000 a year by way of licenses for selling the tickets therein, when he could purchase at the same price, to say the least of it, of the Town Hall commissioners, schemes identical in every respect, and possess the same power in the sale of his tickets without paying any thing for it? Who would treat for a moment, with the State commissioners for the purchase of lottery schemes, when he must guaranty to the State, the payment of at least $15,000, and could make no purchase at a rate below five per cent. on the amount of tickets he should sell; when by buying the same schemes of the Town Hall commissioners, he would be exempted from all guaranty, and might purchase his schemes at any price that might be agreed on by the contracting parties. To induce us to infer that the General Assembly intended to make such extraordinary discriminations in favor of State Armory and Town Hall lotteries, as against State lotteries, drawn for the purpose of public revenue, other and stronger reasons must be urged than were suggested on the present trial. But suppose this State Armory and Town Hall is to be magnified into such a pre-eminent State concern, that it shall over ride not only all other previous lottery grants, but prostrate that system of State revenue, derived from the drawing of lotteries, which had been reared and protected, by so much special legislation; are we not to give the same construction to the act of 1839, chap.

234, granting lottery privileges to raise a sum of money, in aid of the construction of an outlet lock of the Tide Water Canal at Bell's Ferry, and to the act of 1839, chap. 219, authorising a lottery to raise a sum of money for building a Masonic Hall at *Elkton* in *Cecil* county, and the act of 1839, chap. 146, granting a lottery to aid in the construction of a Town Hall or Odd Fellows Hall at *Easton*, all of which acts of Assembly confers on its commissioners, in every respect, precisely the same powers and exemption, in reference to the exercise of the franchise granted, that are by the act of 1838, conferred on the Town Hall commissioners? If the argument of the appellant's counsel be a sound one, we do not see how we can avoid arriving at that conclusion. And yet it would be a startling proposition to assert that by these acts of Assembly, this outlet lock, Masonic Town Hall, and Town or Odd Fellows Hall, were converted into such absorbing, paramount State objects, that we are to presume, without the semblance of an expression of the will of the Legislature to that effect, that it designed for the accomplishment of these objects, to sacrifice the public revenue derived from State lotteries; and to confer on the lottery commissioners under these three acts of Assembly, all the powers heretofore exclusively vested in the State of lottery commissioners to raise a revenue for the public benefit, and which powers (apart from the act of 1838,) as now interpreted, were denied to the commissioners and managers under all other lottery grants, emanating from the State : and were not exercised by the Lottery commissioners, even whilst raising a revenue for the State, but under a specially delegated authority. By such a construction there is entailed upon the State, for a period perhaps, of almost interminable duration and of the most odious character, a lottery system, in a great degree beyond the reach of legislative regulations or restraint, and resting in the almost uncontrolled will of the lottery dealers. And this too, in opposition to the known wish of the Legislature, as evinced by the act of 1834, ch. 219, and more strongly manifested by the act of 1839, ch. 31—to provide by constitutional enactment for the approach, within some rea-

sonable time of the day, when the drawing of lotteries should be at an end in Maryland.

To deprive the State of the means of raising a revenue under such circumstances, by such an implication of power, would we think, be a case in the annals of legislation, without a precedent or authority to sustain it. Infinitely more judicious and consistent with the designs of the Legislature would it have been, to have abandoned all drawing of lotteries for the benefit of the State, and to have drawn them for the State Armory and Town Hall, until the nett sum of $225,000 was raised, than to have clothed the Town Hall commissioners with the powers they now claim. Had such a proposition been made to it, by the projectors of this grand State Armory and Town Hall project, there is no difficulty in divining what its answer would have been.

But we are told, that the State lottery commissioners have themselves given the appellants construction to the act of 1838, by approving of new schemes, after the drawing of schemes purporting to have raised more than the sum of $225,000. What these commissioners may have done, through inadvertence, or misconstruction of the provisions of the acts of Assembly, or a misconception of their duties or powers, or any other cause, can have no influence on the opinion of this court in the case before it.

The appellant's counsel have relied with great confidence on the *third* section of the act of 1838, chap. 323, as demonstrating that their grant is not exhausted, because as yet, they have received, for schemes sold, but a small part of the sum they were authorised to raise, and that by the explicit terms of that section, they are empoweerd to continue the selling of schemes, until they have realized from such sales, the nett sum of $225,000. No man, say they would buy a scheme, and pay for it, the entire amount which it purported to raise. This common sense proposition cannot be denied; and therefore the Legislature must have contemplated, in thus giving the power to sell, that the schemes would be sold for a less sum than by their drawing, they were competent to raise. The third sec-

tion of the act of 1838, conclusively proves that, if any rational mind could have entertained any doubt upon the subject, had that section of the act of Assembly been wholly omitted.  But it is the inference which the appellants draw from the proposition that we controvert: That inference is, that the Town Hall commissioners are warranted in selling schemes, until their receipts from such sales realize the nett sum of $225,000, the amount authorised to be raised by the act of 1838, and its supplement.  Does the language used in the act of 1838, chap. 323, and its supplement of 1839, chap. 52, support this inference? In the question we propose to examine, upon a superficial view of these acts of Assembly, there is some plausibility in the construction of them given by the appellants.  But its fallacy, we think apparent, upon a more attentive perusal.  It will not be denied, as before stated, that it was the expectation and design of the Legislature, that the purchasers of schemes in the Town Hall lottery, were to acquire them at a less sum than on their drawing they were competent to raise.  Upon no other conceivable motive, would any lottery dealer become such a purchaser.  As a corollary, from this postulate, it must be admitted, that if the Legislature intended to authorise the Town Hall commissioners to sell schemes of lotteries without limitation as to price, until from such sales they received the nett sum of $225,000, that the purchasers of such schemes may lawfully draw all they shall have purchased; notwithstanding, that by such drawing they might raise ten times (for example,) the amount received by the Town Hall commissioners.  If the transfer of such authority was not contemplated by the Legislature, it would have passed a law manifestly enabling these commissioners to practice the grossest fraud, that was ever practised, upon an unsuspecting man..  If it did not intend to invest these purchasers with such power, then we think the implication almost irresistible, that it did not design to authorise the sale of more schemes than were competent to raise by their drawing, the sum of $225,000.  Does the act of 1838, with its supplement of 1839, by any fair interpretation of the language used in

them, confer such a power on these commissioners, is the inquiry we propose to consider? So far from it, both the original act and its supplement, negative such an implication of power in the clearest terms. The *third* section of the act of 1838, provides, "that the said commissioners, appointed by this act, may sell for such sums of money as they may deem proper, the scheme or schemes aforesaid, and *the purchasers thereof and their assigns, shall have and enjoy all the rights and privileges in the disposal of the tickets in said schemes, and the raising money therefrom as are conferred on said commissioners.*" And the supplement thereto, passed in 1839, chap. 52, for the purpose of increasing the sum authorised to be raised in the original act from $150,000 to $225,000, provides, "that the privilege of drawing a scheme or schemes of lotteries, conferred by said act and this supplement, shall cease as soon as by the drawing of the said schemes, the nett sum of $225,000 shall have been raised." The *third* section of the act of 1838, is to be construed in connection with the first, and limits and explains its meaning, showing to what extent the right of sale was conferred, and the powers thereby transferred to the purchasers, which powers are defined in language too explicit, we conceive, for a controverted construction, and give to purchasers "all the rights and privileges in the disposal of the tickets in said schemes, and *the raising money therefrom,* as are by this act, conferred on said commissioners." What was the power of the commissioners in raising money and selling tickets in lottery schemes? Why, it ceased to exist the moment $150,000 nett were raised, by the drawing of schemes; and in the hands of the purchasers of schemes it terminated in the occurence of the same event. This interpretation of the Town Hall lottery privilege, is still more explicitly announced in the supplement of 1839, which declares that the lottery privilege shall be extinct, *"so soon as by the drawing"* of schemes, "the nett sum of two hundred and twenty-five thousand dollars shall have been raised." No discrimination is intimated, between schemes drawn by the Town Hall commissioners and their purchasers. From the positive terms of these enactments, it

appears to us, that the powers claimed by the Town Hall com-
missioners, cannot be deduced from the authority given them
to sell schemes of lotteries, and that had they sold schemes,
competent to raise five millions of dollars, the moment the pur-
chasers had by the drawing of those schemes, or any of them,
raised the nett sum of 225,000, from that moment the lottery
privileges under the purchased schemes were exhausted, and
all power to sell schemes or draw lotteries under the Town
Hall grant, was at an end, although in point of fact the Town
Hall commissioners may not have realized from the sale of
schemes, one-tenth part of the sum of $225,000.   In favor
of the alleged power to sell schemes until the actual receipt of
$225,000, it has been strongly pressed in the argument, that
the Legislature intended that the State Armory and Town Hall
should be finished ; that this could not be effected for less than
$225,000; and that the Legislature would not therefore have
licensed sales of schemes by the commissioners, "for such
sums of money as they may deem proper, unless it had con-
templated, that the loss sustained by the sale of schemes should
be restored to the amount to be raised by the lottery grant, by
the sale of additional schemes.   Before we assent to the con-
clusion attempted to be drawn from these premises, we must
first be satisfied of their truth, which we cannot assume in the
absence of all proof.  Not knowing what representations were
made to the Legislature, as the basis of this provision of the
act of 1838, we cannot consent to speculate in the wide field
of conjecture concerning it.   Nor if we did, would we con-
sent that such speculations should at all affect our construction
of the lottery grant before us, as we can readily imagine the
existence of a state of facts, which induced the legislation in
question, and which is not only in accordance with, but would
greatly strengthen the opinions we have formed on the subject.

But it is urged, that the latter part of the third section of
the act of 1838, which provides, "that the said commissioners
shall make report, verified by affidavit, immediately upon ma-
king the sale or sales of a scheme or schemes as aforesaid,
particularly certifying the amounts and terms of such sales,"

clearly proves, that these sales were to be continued, until the sum of $225,000 was realized from their proceeds; and that this *proviso* of the act of Assembly is inoperative, and without object upon any other hypothesis. Neither of these propositions can, in our opinion, be sustained. This provisory enactment is, in every aspect in which it may be viewed, as necessary, and as perfectly consistent with the designs of the Legislature, had they been, that the commissioners should sell only such number of schemes, as upon their face, were competent to raise the stipulated amount, as if such sales were to be continued until the specified sum had been realized by the commissioners; and its operation equally apparant and efficient upon either assumption of the legislative design. The second section of the act of 1838, had directed, that the commissioners should give bond "for the due application for the purposes of this act, of the monies coming to their hands as commissioners." When therefore, by the *third* section, they were authorised to sell the schemes of the lotteries, it was a necessary precaution in order to the enforcement of the bond, that reports should be made by the commissioners, of the amuonts received by them on the sales of schemes. But upon our construction of all lottery grants, (other than those drawn by the lottery commissioners for the benefit of the State, under peculiar legislative provisions applicable to them only,) that every scheme raises the sum that it purports to raise, no report of the receipts of the Town Hall commissioners was necessary, and therefore the law required none. Because the sum, in legal contemplation raised, was known to the lottery commissioners, whose duty it was to determine on the exhaustion of the Town Hall lottery grant, when called on to approve schemes to be drawn under it; and the public were presumed to possess the same knowledge, through the medium of the public newspapers, in which the community are notified of the lottery schemes to be drawn. But the sum received on the sale of a lottery scheme, rests only in the knowledge of the vendor and vendee: hence the necessity for the report required in this case.

It has been said that the act of 1838, cannot defeat or

retard the gratification of the wish of the Legislature, to secure at some rsasonable time, the termination of all lottery privileges in Maryland, or entail upon us an odious, demoralizing, protracted, lottery scourge; because by the supplement of 1839, chap. 52, it is provided, that the Town Hall lottery privilege shall not extend beyond the period when the existing lottery grants shall have expired.  But how easy would it be for the commissioners of this mammoth lottery grant, to obtain the control of some minor lottery privilege, whose time of drawing has no limitation, and thus secure the indefinite duration of its powers.  And further, if we ascribe to the Town Hall lottery grant, the alarming powers which are claimed for it, we must yield the same to the Town or Odd Fellows Hall lottery privilege, in the drawing of which, there is no limitation as to time.

The views which we have expressed upon the principal matters in controversy in this case, render it unnecessary to decide several minor incidental points, which were raised in the argument.

The orders of the Chancellor, granting and continuing the injunction issued in this case are affirmed.

ORDERS AFFIRMED.

BUCHANAN, C. J., and ARCHER, J., dissented.